UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-14033-CR-GRAHAM/MAYNARD

UNITED STATES OF AMERICA,

 Plaintiff,

v.

DARRELL LAVERN REAVES,

 Defendant.
_____/

FILED by _____ D.C.

FEB 09 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

## REPORT AND RECOMMENDATION ON FINAL HEARING IN RESPECT TO THE PETITION ALLEGING VIOLATIONS OF SUPERVISED RELEASE

THIS CAUSE having come on to be heard for a final hearing in respect to the pending Petition Alleging Violations of Supervised Release [D.E. 907], and this Court having received testimony, evidence, and arguments of counsel, recommends to the District Court as follows:

1. Defendant is charged by a Petition with the following violations of supervised release:

| | |
|---|---|
| **Violation Number 1** | **Violation of Mandatory Condition**, by failing to refrain from violation of the law. On or about September 17, 2017 in Indian River County, Florida, the defendant did commit the offense of Battery-Domestic Violence [against A.W.], contrary to Florida Statute 784.03(1)(C). |
| **Violation Number 2** | **Violation of Mandatory Condition**, by failing to refrain from violation of the law. On or about September 17, 2017 in Indian River County, Florida, the defendant did commit the offense of Battery-Domestic Violence [against J.T.], contrary to Florida Statute 784.03(1)(C). |

2. The Court heard testimony on this matter on January 8, 2018 and January 16, 2018. The government called five witnesses including Defendant's former girlfriend, Amina

1

Wilson, her daughter, J.T., U.S. Probation Officer Christina Williams, and two deputy sheriffs from the Indian River County Sheriff's Office, Cameron White and Wang Le. Defendant elected to testify in his own behalf. All of the witnesses testified about an incident that occurred on the night of September 16th into the early morning hours of September 17, 2017 at an apartment in Vero Beach, Florida where Defendant lived with Wilson, their four year old child, and Wilson's other three children. The incident resulted in Defendant being arrested and charged with two counts of battery/domestic violence. The incident occurred less than two months before Defendant's five year term of supervised release was scheduled to end. From a review of the docket in this matter, this appears to be the first violation of supervised release petition filed against Defendant during his entire time on supervised release.

3. The government's first witness was Wilson's daughter, J.T. J.T. is 18 years old, but was a minor at the time of the alleged incident so the Court will use her initials throughout this report. J.T. testified that on the night of September 16, 2017, she heard her mother screaming "Please stop!" (1/8/18 Transcript at 12-13). J.T. ran into her mother's bedroom and saw Defendant with his fist balled up hitting her mother in the head. (*Id.* at 13-14). J.T. saw Defendant punch her mother two or three times. (*Id.*). J.T. tried to pull him off of her mother, saying "Mr. Darrell, just stop!" (*Id.*). When J.T. tried to intervene, Defendant slammed J.T. to the ground. (*Id.* at 14-15). J.T.'s mother then hit Defendant over the head with a wine bottle. (*Id.*). Defendant started bleeding "a lot" and went into the bathroom. (*Id.* at 16-17). When Defendant came out of the bathroom, he was "screaming and ranting" and destroyed the apartment—ripping and kicking down two doors, pulling the light fixture in the kitchen down, throwing a lamp, television, computer tower and monitor over, and shattering glass all over the floor. (*Id.* at 17-29).

4. The government introduced Exhibits 3 through 16, which are photographs taken by police on September 17th. (*Id.*). J.T. described these exhibits to the Court. Exhibit 3 shows glass all over the floor by the front door from candleholders Defendant broke that night. (*Id.* at 25). Exhibit 4 shows a lighting fixture in the kitchen torn down by Defendant. (*Id.* at 25-26). Exhibits 5 and 6 show a pantry door that Defendant ripped off the hinges. (*Id.*). Exhibit 7 shows the same pantry door, alongside a lamp thrown to the floor by Defendant. (*Id.* at 27). Exhibits 8 and 9 show a large television, computer tower and monitor knocked to the floor by Defendant. (*Id.* at 27-28). Exhibits 10 and 11 show the door to J.T.'s bedroom, which Defendant kicked down when J.T. and her mom fled there. (*Id.* at 28-29). Exhibits 12 and 13 show J.T. that night with blood on her hands. (*Id.* at 29). J.T. said the blood belonged to "Mr. Darrell," who was "bleeding all over the place" after being hit with the wine bottle. (*Id.*). Exhibits 15 and 16 show Wilson holding her lip away from her face to show a bruise inside her mouth.[1] (*Id.* at 30). J.T. heard her mother tell the officers, "Look what he did to my lip." (*Id.* at 22.).

5. The government introduced Exhibit 17, which is a written statement J.T. provided to police that night. (*Id.* at 30-31). J.T. wrote the statement on her own without assistance from anyone, including her mother, and did not review the statement prior to her testimony at the hearing. (*Id.*) J.T. wrote:

> I was on the phone with a friend and all I heard was "Please stop hitting me." I ran in the room to see him on top of [my mother] hitting her. I grabbed him by the arm and told him to stop hitting my mom. He pushed me in the shoulder and told me to get the hell out. He then picked me up and slammed me on the floor hitting my head on the cabinet. My mom grabbed the bottle and hit him in the head. He trashed everything in the house. And kicked my bedroom door in. My mom was in the closet on the phone with the police and we were standing next to the closet to make sure he didn't get in. His name is Darrell Reaves.

---

[1] Exhibit 14 did not show anything relevant to the case, and was stricken.

6. On cross-examination, defense counsel pointed out that J.T. initially said Defendant was standing over her mother with his fist balled up when J.T. entered the bedroom, but later said she saw Defendant hitting her mother when she came into the bedroom. (*Id.* at 35-37). J.T. clarified that both statements were true—when she ran in, she saw Defendant with his fist balled up standing over her mother and punching her. (*Id.* at 38-40, 46). Defense counsel then suggested Amina Wilson hit Defendant with the wine bottle *before* J.T. ran into the bedroom. (*Id.* at 38). J.T. responded,

> No. You are getting the story mixed up. I went into the bedroom, and he hit her two or three more times; and after that, I was grabbing him, telling him to 'stop, it is not worth it,' and that's when he slammed me on the ground. When he got up and turned around, my mom hit him with the bottle.

(*Id.*). Defense counsel asked why J.T. wrote in Exhibit 17 that she hit her head on a cabinet, but failed to mention that detail in her testimony. J.T. answered, "Well, now that you bring it up, yes, I did." (*Id.* at 40-41). Throughout J.T.'s cross-examination, counsel repeatedly attempted to re-characterize Defendant's conduct towards J.T. as a "push" or "shove," but J.T. was adamant: "I keep saying 'slammed,' but you keep changing it back." (*Id.* at 41).

7. The government's next witness was J.T.'s mother, Amina Wilson. Due to the rule of sequestration, Wilson was not in the courtroom during her daughter's testimony. At first, Wilson testified that she called the police in the early morning hours of September 17th because Defendant hit her in the mouth. (*Id.* at 48-49, 55-56). A few moments later, however, Wilson re-characterized what happened between her and Defendant as "an argument and a scuffle," in which she received "maybe a scratch or a scrape" on her lip. (*Id.* at 55-58). She said she did not remember Defendant touching anyone else in her family that night but acknowledged that "in the commotion" he probably did. (*Id.* at 56.) Wilson repeatedly told the prosecutor she could not

remember any details. She acknowledged providing written statements to police and probation, and said she was truthful in those statements, but claimed she only gave probation a statement because the probation officer told her she "had to" come down and do so. (*Id.* at 62-63, 70-73).

8.  Wilson's written statements to police and probation were the subject of heated debate during the hearing and stand in stark contrast to her vague and contradictory statements on the witness stand. Government's Exhibit 1 is the written statement Wilson provided to police on September 17. Wilson wrote:

> We were having a verbal disagreement while [Darrell] was on the phone and he came in the room and started punching me in the face and head. My 17 year old daughter came in the room and yelled at him to stop hitting me when he picked her up and slammed her on the floor causing her to hit her head. As a mother protecting her child I grabbed the wine bottle and hit him in the head. He then proceeded to break my light bulbs and damage other things in my apartment like closet doors, pantry door, my computers, my tv in the living room. After that I called the police because I feared that he would destroy my apartment.

9.  Government's Exhibit 2 is the written statement Wilson provided to Defendant's probation officer a month after the incident on November 17, 2017. Government's Exhibit 2 is a five page, hand-written, single-spaced document, in which Wilson provides numerous details she apparently could not remember when she testified under oath at the hearing. Wilson wrote that the argument started at her mother's house, where they had gone to drop off a washer. Defendant was talking to his friends in the apartment complex when Wilson and the four year old were ready to go. Wilson turned on Defendant's truck "thinking that would hurry [him] up to go home." Defendant got in the truck, yelling and upset, and repeatedly asked her "Who told you to turn my truck on?" They argued as Defendant drove home, where the argument escalated. At some point, Defendant telephoned a friend to complain about Wilson. Wilson says she went in the bedroom when,

[a]ll of a sudden, Darrell appeared in the bedroom coming towards me so when I stood up he punched me in the mouth and then punched me in my jaw. I immediately turned my back towards him because I didn't want to be hit in my face anymore. When I turned around I was blocked in between the bed and Darrell and he started punching me in the back of my head at least 10 to 12 times. I started screaming for him to stop hitting me, stop hitting me please and I told him that he was gonna kill me. By then I heard my daughter's voice. She had come into my bedroom and she was yelling "Mr. Darrell stop hitting my momma." She was pulling his arm and his shirt and he stepped back and bald [sic] his fist as if he was going to hit her but he didn't. Instead he picked her up off the floor and slammed her down hard causing him to fall with her and causing her to hit her head on some of my room furniture. That's when I grabbed the wine bottle and hit him in the head.

10.  On cross examination, Wilson stated that she did not wish to pursue charges against Defendant and had filed an affidavit in state court to have the charges dismissed. (*Id.* at 66-67).

11.  Next, the government called United States Probation Officer, Christina Williams, to the witness stand. USPO Williams was Defendant's assigned probation officer. USPO Williams testified that she contacted Wilson on September 25, 2017 after learning of the state charges. Wilson said she did not want to press charges. A month later, USPO Williams contacted the state prosecutor because the charges were still pending. The prosecutor responded that the victims had changed their minds and wished to prosecute. USPO Williams then called Wilson again, and this time Wilson said she did want to press charges. USPO Williams asked Wilson to come in to the office to provide a statement, which Wilson did on November 17th. Wilson was cooperative when she came and USPO Williams did not tell Wilson she "had to" come in to write a statement. A month later, Wilson changed her mind again and called USPO Williams to say she no longer wanted to prosecute. By that time, a federal supervised release petition had already been filed. (*Id.* at 77-81).

12. The government called Deputy Sheriffs Cameron White and Wang Le from the Indian River County Sheriff's Office. (1/16/18 Transcript at 3-71). They testified that they responded to Defendant's apartment in the early morning hours of September 17, 2017 due to a reported disturbance. (*Id.* at 5, 46). Deputy White arrived first. He knocked on the front door and yelled "Sheriff's Office" multiple times, but nobody answered. (*Id.* at 7). Finally, the door was opened and Defendant, Wilson, J.T. and a small child were inside. (*Id.* at 6-7). Deputy White separated them, sending Wilson and J.T. to opposite ends of the hallway, and having Defendant sit in front of the apartment door. (*Id.* at 7, 47). Defendant did not comply with Deputy White's request. (*Id.* at 5). The officer had to "almost pull" Defendant out the front door to get him to sit down in front of the apartment. (*Id.*). Deputy White also had to "make sure Defendant stayed where he was and didn't move around a lot." (*Id.* at 7).

13. Deputy Le arrived a few minutes after Deputy White. Deputy Le observed J.T. "in distress and crying." (*Id.* at 47). J.T. said she heard her mother yelling in her bedroom, went in and saw her mother's boyfriend punching her mother in the face. She tried to get her mother's boyfriend to stop, and he pushed J.T. back causing her to hit the wall. When they tried to hide in another bedroom, her mother's boyfriend kicked in the door. (*Id.* at 47-48, 54).

14. Deputy Le also talked to Amina Wilson. Wilson told him she hit Defendant with a wine bottle. (*Id.* at 49). Both Wilson and J.T. provided written statements. Deputy Le sat them in separate areas of the kitchen to write their statements, which they did without talking to each other. (*Id.* at 50-53, 71). They swore under oath to Deputy Le that their statements were accurate. (*Id.*). Deputy Le also took pictures of the destruction inside the apartment. (*Id.* at 51).

15. Deputy White spoke briefly with Wilson to get an idea of what happened. (*Id.* at 41). Deputy White remembers Wilson saying Defendant kicked in the bedroom door, threw her

down, got on top of her, and punched her in the head ten or twelve times. (*Id.* at 8). She said her daughter ran into the room and tried to pull Defendant off of her. (*Id.* at 20-21). Defendant then grabbed her daughter and pushed her into a wall, so Wilson hit him over the head with a wine bottle. (*Id.* at 20-21). Deputy White's impression from talking to Wilson was that Defendant destroyed the apartment *before* attacking Wilson. (*Id.* at 16, 44). Deputy White did not speak to J.T. (*Id.* at 41).

16.   On the scene, Deputy White's role was to interview, stay with and transport Defendant. Defendant told Deputy White he was talking on the phone when Wilson got mad out of nowhere and hit Defendant on the head with something. (*Id.* at 9, 34-35). Deputy White saw a laceration on Defendant's face, and blood all over Defendant's face and clothing. (*Id.* at 26, 29-31). Deputy White said Defendant's speech was slurred and his breath smelled of alcohol. (*Id.* at 9-10, 13). Defendant was talking "very loudly" and said several times that he was on federal probation and did not want to go to jail. (*Id.*). When Deputies White and Le tried to put Defendant in handcuffs, Defendant refused to stand up as directed. (*Id.* at 7, 68). The officers told Defendant to get up multiple times, and finally had to pick him up off the ground to get the handcuffs on him. (*Id.* at 7, 11, 68). While walking to the patrol car, Defendant began yelling "Black Lives Matter" to onlookers who had gathered nearby. (*Id.* at 10). Defendant continued to yell "Black Lives Matter" from the back of the patrol car. (*Id.*) Deputy White took Defendant to the emergency room, where Defendant continued to talk very loudly and argued with the nursing staff. (*Id.* at 15).

17.   The interviews with Wilson and J.T. were not recorded. (*Id.* at 69-70). Deputy White wrote his report about four hours after he arrested Defendant. (*Id.* at 9, 23). Deputy Le

could not recall how much time went by, but acknowledged that he did not write the report immediately. (*Id.* at 69).

18. The government rested its case.

-----------------

19. Defense counsel introduced Defense Exhibits 1A, 1B, 2 and 3 into evidence. Defense Exhibits 1A and 1B are photographs Defendant took of himself the night of the incident. They show a gash on Defendant's forehead, and copious amounts of blood on his head, face and shirt. Defense Exhibit 2 is a notarized letter from Wilson requesting dismissal of the criminal charges against Defendant in Indian River County. Defense Exhibit 3 is a *Nolle Prosequi* filed by the State Attorney's Office dismissing those charges.

20. Defense counsel called Defendant to the witness stand. Defendant testified that he was born and raised in Fort Pierce, and remained in the community after graduating from high school. (*Id.* at 73-74). He is gainfully employed full time as a truck driver, and has his Commercial Driver's License (CDL) Clearance A. (*Id.*) In September 2017, Defendant and Wilson shared a residence in Vero Beach. They had lived together at that point for two years. (*Id.* at 75-76, 83).

21. Defendant testified that on the night of the incident he was on the phone with a friend named Edwin Hill talking "junk" about Wilson and her other children's father. (*Id.* at 76). Specifically, Defendant said he made comments about sexual activity between Wilson and her ex, and said the ex does not pay child support while Defendant bears the burden of taking care of the ex's children. (*Id.* at 76-79). All of a sudden Wilson hit him "on the head with something." (*Id.*). Defendant lost consciousness for two or three minutes, his head was ringing, he was dazed and he suffered a slight concussion. (*Id.* at 80). When he regained consciousness, he went in the

bathroom to take pictures of his injuries. He admitted that when he came out of the bathroom, he "tore up" and "ramshackled" the apartment. (*Id.*)

22.  Defendant testified that he did not physically struggle with Wilson or J.T., did not strike Wilson in the head, did not shove or slam J.T. in any way, and was not drinking alcohol that night. Defendant said Wilson was drinking wine. (*Id.* at 79-82).

23.  On cross-examination, the government suggested Defendant's testimony conflicted with a prior statement he made to his probation officer that Wilson hit him because she thought he was on the phone with another woman. Defendant denied making that statement to his probation officer. (*Id.* at 85-87). The government also implied Defendant did not disclose his residence at the Vero Beach apartment to his probation officer as he is required to do. (*Id.* at 83-85). Defendant said he provided accurate information to the probation office, but he has had more than one probation officer over the years.[2] (*Id.* at 83-85, 89).

24.  The defense rested its case.

## ANALYSIS

25.  This Court has considered all of the evidence submitted, being the sworn testimony and exhibits, as well as arguments of counsel. The standard of proof in violations of supervised release is by a preponderance of the evidence and not beyond a reasonable doubt. Revocation of supervised release is treated as part of the penalty phase for the initial offense involved. To constitute a violation, the conduct involved need not be criminal and the defendant

---

[2] The government attempted to re-call U.S. Probation Officer Williams to rebut Defendant's testimony about reporting his address at the Vero Beach apartment to Probation. The undersigned allowed the government to ask Defendant about this issue on cross examination in an effort to impeach his credibility, but declined to allow collateral proof on this issue because it is extrinsic to the alleged violations, namely, whether Defendant committed domestic violence battery on Wilson or J.T. on September 17th.

need only be found culpable by a judge under a preponderance of the evidence standard. *United States v. Cunningham*, 607 F.3d 1264 (11th Cir. 2010).

26.     To establish Violation Numbers 1 and 2, the government must prove by a preponderance of the evidence that on or about September 17, 2017, Defendant committed battery-domestic violence against Wilson (Violation Number 1) and against J.T. (Violation Number 2). The offense of battery occurs when a person: (1) actually and intentionally touches or strikes another person against the will of the other; or (2) intentionally causes bodily harm to another person. § 784.03(1), Fla. Stat.; *Hamrick v. State*, 648 So. 2d 274, 276 (Fla. 4th DCA 1995). Domestic violence battery is "battery…of one family or household member by another family or household member." Fla. Stat. § 741.28(2). "Family or household member" includes "persons who are presently residing together as if a family or who have resided together in the past as if a family, and persons who are parents of a child in common regardless of whether they have been married." Fla. Stat. § 741.28(3). The parties agree that on September 17, 2017 Defendant, Wilson and J.T. resided together as a family and Defendant and Wilson have a child together. As a result, on that date they met the definition of "family or household members" as required under Florida law. The disputed issue is whether Defendant battered Wilson by hitting or punching her and battered J.T. by pushing or slamming her. Having considered the evidence, heard the testimony of the parties, and observed the demeanors of everyone involved, this Court concludes that the answer to this question is yes.

27.     This Court finds the testimony of J.T. credible. She impressed the Court as the only person present during the altercation who took the stand and told the truth. J.T. had the opportunity and ability to accurately observe what happened, and – unlike Defendant and her mother—she has no particular reason not to tell the truth. In fact, J.T. testified that she had never

seen Defendant engage in this sort of behavior towards her mother before. Her demeanor on the stand was emotional but direct. It was apparent to the Court that she did not want to be there telling this very difficult story about the person she knew as "Mr. Darrell."[3] Nevertheless, she understood the questions and answered them directly, clearly recounting what she heard, saw and experienced that night.

28. J.T.'s testimony was consistent in every material respect with her verbal and written statements to police on September 17th. She gave the same account on the stand that she gave in her written statement—she heard her mother yelling at the Defendant to "please stop"; she ran in the bedroom and saw Defendant punching her mother with his fist; she tried to intervene and Defendant physically slammed her; her mother responded by hitting Defendant over the head with a wine bottle; and Defendant checked out his injuries and then wrecked the apartment. This Court is not persuaded by defense counsel's focus on inconsequential details about whether she was "pushed" or was "slammed," or hit the wall, the floor or a piece of furniture as she fell. These details are not significant, and are likely all true given Officer Le's observation that the bedroom where the incident occurred was very small, with little room between the wall and bed. (1/16/18 Transcript at 55). The key point is that the essence of J.T.'s story has remained the same from the beginning.

29. J.T.'s testimony was also consistent with the statements her mother gave *before* she decided not to press charges. A comparison of Government's Exhibits 1 and 17, which are J.T. and Wilson's written statements from that night, shows their statements are nearly identical in every respect, despite having been written separately. Deputy White arrived on the scene "in

---

[3] The Court observed Defendant, on the other hand, shaking his head, smirking and laughing at J.T. while she testified.

12 of 14

the middle of" the commotion. (*Id.* at 35). Prior to his arrival, even Defendant admits he was wreaking havoc in the apartment.[4] There was simply not enough time while Defendant was ripping and kicking down doors and tearing up the apartment for the two women to concoct a false story they could tell so consistently thereafter. Moreover, when the officers arrived on the scene, J.T.'s and Wilson's demeanors were consistent with what one would expect of battery victims in that moment. They were "scared," "in distress," "crying," "physically shaking" and "stuttering." (*Id.* at 6, 15, 17, 47, 50). Defendant, on the other hand, would not even comply with the officers' requests to come out of the apartment and stand up to be handcuffed.

30.     J.T.'s testimony is also consistent in all material respects with Wilson's written statement provided to probation a month after the incident (Ex. 2). Again, defense counsel encourages the Court to focus on small differences between the statements regarding whether Wilson was on the "bed" or the "floor" when Defendant was punching her, or whether Defendant was standing over Wilson or physically on top of her while punching her. These discrepancies are minor, however, and are not proof of false testimony. In fact, such differences in perception can be expected when a physical altercation takes place in a small space like the bedroom at issue here. (*Id.* at 55). They can also be expected when, as here, multiple witnesses are remembering and recounting a stressful and traumatic experience from different perspectives.

31.     In sum, this Court concludes that J.T.'s testimony as to what she heard, saw and experienced that night is consistent with and corroborated by the rest of the government's evidence. Her testimony is consistent with her prior verbal and written statements; it is

---

[4] In an apparent attempt to discredit Wilson's statements to the police, defense counsel emphasized Deputy White's impression that Defendant destroyed the house *before* Wilson hit him with the wine bottle. From this, defense counsel wants the Court to infer Wilson told Deputy White this untruth. The more reasonable explanation, however, is that Deputy White misunderstood or misremembers what he heard since even Defendant admits he destroyed the apartment *after* he was hit with the bottle. .

consistent with her mother's verbal and written statements before deciding not to press charges; it is consistent with the officers' impressions of what they found when they arrived and with the demeanors of everyone involved; and it is consistent with the photographs presented at the hearing. This Court did not find Defendant's testimony or Amina Wilson's testimony on the stand credible. As a result, this Court finds that the government has met its burden to establish by a preponderance of the evidence that Defendant committed domestic violence battery against Amina Wilson by punching her in the face and head (Violation Number 1), and against J.T. by physically throwing or slamming her (Violation Number 2) on September 17, 2017 as charged in the Petition for Violations of Supervised Release.

**ACCORDINGLY**, this Court recommends to the District Court that the Defendant be found to have violated his supervised release in respect to Violation Numbers 1 and 2. The parties shall have fourteen (14) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable Donald L. Graham, the United States District Judge assigned to this case. Pursuant to Federal Rules of Criminal Procedure, Rule 59(b)(2), failure to file objections timely waives a party's right to review and bars the parties from attacking on appeal any legal rulings and factual findings contained herein.

**DONE AND SUBMITTED** this 9th day of February, 2018 at Fort Pierce, Northern Division of the Southern District of Florida.

SHANIEK M. MAYNARD
UNITED STATES MAGISTRATE JUDGE